BARSALOU *vs.* WRIGHT.

*In the matter of the estate of* WILLIAM WRIGHT, *deceased.*

WHERE, after an advertisement under the statute by an executor or administrator for claims against the deceased, a demand is presented by a party claiming to be a creditor of the estate, and it is disputed or rejected, the claimant, unless the matter in controversy be referred, must within six months after such dispute or rejection, or within six months after the demand or some part thereof shall have become due, commence a suit for the recovery thereof, or be forever barred from maintaining any action.

This statute has for its object an expeditious settlement of estates, and should not receive a narrow or strict construction. By its terms it relates only to actions at law, but the rule will be applied by way of analogy to proceedings on claims in the Surrogate's Court.

When a demand is presented to an executor or administrator, there should be a positive and explicit dispute or rejection, to make this statute of limitations applicable.

If the supposed rejection be apparently deliberative, and not definitive, and the claim be subsequently treated by the parties as under consideration, the statute will not begin to run until a final rejection has been notified to the claimant.

BECK & McADAM, *for Petitioner.*

I. For the purposes of this argument, it is a conceded point, that Mr. Barsalou's claim is a just and valid one, unless it is barred by the six months statute of limitations. (2 *R. S., 3d ed., p.* 153, § 41.)

II. The statute, the benefit of which is claimed by the executor in this proceeding, was never designed to apply to such a case as this : the case of an executor having an abundance of assets still in hand, and being fully apprised that the claimant never wavered in the assertion of his claim, but was continually from time to time urging its payment. The design of the statute obviously was to enable the executor to consider as abandoned, a claim which he had peremptorily rejected, and which the creditor allowed to lie dormant for

six months following, and to make a settlement of his affairs accordingly, in which case the interest of all concerned requires that, as a general rule, the course provided by this statute should be adopted. But here no one is to be injured if the statute should *not* be held a bar ; while on the other hand *to hold the claim barred* by the statute is to prevent Mr. Barsalou from recovering a confessedly honest demand against an estate abundantly able to pay.

III. An executor is *not bound* to plead the statute of limitations to an action commenced against him by a creditor of the testator, for a debt which he believes to be a just one, and his acknowledgment will prevent the statute running against it. (*Hammon* vs. *Huntley*, 4 *Cowen*, 493 ; *Dayton's Surrogate, p.* 137, *and authorities there cited*).

In view of this fact, it cannot fail to strike the mind of this court as strange, that, under all the circumstances of this case the executor should seek to avoid an inquiry into the real merits of the case, by setting up a mere technicality which in law he is not bound to do, and which in a court of conscience he would not be permitted to do. This view of the matter is presented as giving character to the defence which is here interposed.

IV. The claim never has been rejected within the meaning of the statute.

This statute is held to be and is highly penal in its character, and ought to be strictly construed. The act of dispute or rejection must be such as fairly to apprise the claimant that his demand will be contested. (*Elliott* vs. *Cronk's exrs.*, 13 *Wend.*, 39.)

1. The language of the executor in this case is "I *must* reject." This is not, in common parlance, the language of a fixed determination or conclusion, but is rather argumentative, and designed to call forth a reply. The language should have been that of present import, and unequivocally indicating a final conclusion of the mind—as, "I *have* rejected ;"

" I *do* reject;" " the claim *is* rejected," &c. As it now stands, the supposed letter of rejection may be regarded as a rejection *nisi*, not a rejection final.

2. The fact that the executor deemed it necessary to state the grounds upon which he thought he must reject the claim, and that he seemed to reason the matter with the claimant, is evidence of the correctness of our last position, viz., that the executor had not absolutely ignored or rejected the claim, but was under the impression, unless his views were changed, that he must do so.

3. The grounds upon which the supposed rejection was based being both erroneous, it was natural that the claimant, knowing that fact, should attach no importance to a conclusion based upon a mere imaginary foundation. The supposed rejection was not therefore sufficient " to apprise the claimant that his demand would be contested," and, tried by the rule laid down in 13 *Wendell*, 39, was not sufficient to enable the executor to claim the benefit of this " penal statute."

4. Interpreting the letter in question by the subsequent acts of the parties (and we submit that this is a legitimate and the very best method of learning the very intent of the parties), our construction of it is abundantly sustained. Indeed it is the only construction at all reconcilable with the acts of the parties.

Mr. Barsalou's letter of 28th April, 1856, in immediate response to the so-called letter of rejection, seems to view it as a mere expression of opinion on the part of the executor ; and, enclosing a copy of the paper misnamed *an affidavit*, for the purpose of disabusing the executor's mind of his erroneous impression in reference to it, concludes that, " in settling with the estate, he will find it proper to make a reserve for the amount."

On the other hand, Mr. Eagle's action from first to last, in all his conversations, never once pretending that he had any other answer to the claim than that he was in doubt whether it had been paid or not, is, as we think, evidence most satisfactory and conclusive to show, that the minds of the parties

were in perfect harmony as to the construction of this letter, and that neither of them supposed it to be a rejection of the claim under the statute. Mr. Eagle in his letter to Beck & McAdam of September 13th, 1856, speaks of his former letter as giving his " opinion " merely.

From the above considerations, one of two conclusions is forced upon the mind ; either—

1st. That Mr. Eagle did not deem his letter of April 21st, 1855, as a rejection of the claim, but merely as an intimation of his (then) opinion of the matter ; which view being also adopted by us would, we admit, be held conclusive as to the construction and effect of that letter ; or—

2d. That Mr. Eagle designed his letter as a rejection, and, seeing and knowing that we construed it differently (and, in that view, perhaps, erroneously), instead of undeceiving us on the subject, did all in his power to keep alive the impression under which we were (erroneously ?) acting, in which view his conduct would be at least disingenuous, if not positively fraudulent. And, in this view, his directing his communication to Mr. Barsalou, a layman and a foreigner, instead of sending it to Beck & McAdam, his attorneys, as he had promised to do, would have a very significant bearing upon this matter. We prefer to adopt the former, the most charitable of these conclusions. But whichever horn of the dilemma may be seized upon, the facts clearly make against the executor on the present question.

V. *If* the claim *ever was* rejected, the benefit of that rejection has been effectually waived by the executor.

This court having decided on the preliminary statement or argument of this matter that the executor could waive the benefit of this statute, any argument of the point here is uncalled for. We take the liberty of referring to the case of *Reynolds* vs. *Collins*, 3 *Hill*, 36, as sustaining that doctrine.

It is submitted here that whether the waiver took place before or after the statute had run, is immaterial. But we hold that the evidence clearly shows that it was before the

statute had run against the claim. The witness first says, the second interview may have been a month, it may have been more, after the first interview. The interview is then detailed at length, in which Mr. Eagle states that he is not yet in a condition to settle; that *as soon as he was, Mr. Barsalou's bill should be paid.* That the bill was correct. The only thing he felt uneasy about was the $400 payment, &c. He had searched for receipt and would search again, &c., &c.

Is this the language of a man who has rejected a claim and intends to insist upon it? Could a grosser deception be practised by Mr. Eagle than by talking continually about settling, looking for papers, satisfying his mind, believing Mr. Barsalou to be honest, and the claim to be a fair one, and so lulling the claimant into confidence in his intentions to pay, unless he was satisfied that the money had already been paid, until his communication (which he could not fail to see had been entirely overlooked or misunderstood by Mr. Barsalou) had ripened into a technical defence, then to thrust aside and disregard all such interviews, and flourish his letter in our face triumphantly.

The witness afterwards says this may have been within *two* months, it may have been within *four* months, after the first interview.

A circumstance, in reference to which the witness could not be mistaken, fixes the time of this interview, and shows that the theory of the executor (that this interview took place after the 1st of January, 1856,) cannot be true.

VI. On the whole case we submit that if there ever were a rejection of this claim it has been repeatedly and effectually waived. There is no reason for protecting the executor or the estate from an investigation of the actual merits of this case, but, on the contrary, every reason why the very truth and right of the matter should be laid before this court and simple justice be meted out to all.

J. W. BENEDICT, *for Executor.*

THE SURROGATE.—Victor Barsalou, claiming to be a creditor of the testator, having presented a petition for the payment of his demand, the executor interposed as a defence that he had regularly advertised for claims, that the demand in question had been presented for payment, and had been rejected, and the petitioner failing to institute a suit at law for its recovery within six months thereafter, the claim was barred by the statute.                                         -

The Revised Statutes have provided a convenient and summary method for the ascertainment of demands against the estate of a deceased person.   Six months after the grant of letters the executor or administrator may, under the order of the Surrogate, give notice by advertisement requiring all persons having claims against the deceased, to exhibit the same to the executor or administrator within six months from the day of the first publication of such notice.   When the claim is presented, satisfactory vouchers may be demanded, and also the affidavit of the claimant that the demand is justly due over and above all payments and offsets.   If the justice of the claim be doubted, the matter in controversy may be referred to three referees approved by the Surrogate ; or, if the claim " be disputed or rejected, and the same shall not have been referred, the claimant shall within six months after such dispute or rejection, if the debt or any part thereof be then due, or within six months after some part thereof shall have become due, commence a suit for the recovery thereof, or be forever barred from maintaining any action thereon." (2 *R. S., pp.* 88, 89, §§ 34, 35, 36, 37, 38).   These provisions are judicious, and they afford ready and prompt means for the final adjustment of estates. .  The limitation of six months within which the creditor must bring his action at law, or be forever barred, relates only to the commencement of his suit, and is sufficiently long for all creditors who are in earnest, to determine whether or not they will resort to legal proceedings.   Beyond that period, the law does not permit their doubts or hesitancy, to stand in the way of a distribution of the estate among other parties whose rights

are unquestioned. It would certainly be hard to suspend all creditors, next of kin, and legatees, from the enjoyment of their respective shares, because of some single claim, hanging like a cloud over the whole estate, and which the claimant is in no haste to submit to the decision of a legal tribunal. I consider the statute, therefore, as entirely reasonable, and am not inclined to give it a narrow or strict construction. For example, if the letter be regarded only, then it applies simply to actions at law, and not to proceedings like the present, for the recovery of claims in the Surrogate's Court. I look, however, to its spirit, meaning and intent, and have no hesitation in holding that the limitation of six months within which to bring suit, is applicable in principle to proceedings before the Surrogate, and is not limited solely to actions at law. There is no reason why on such a point there should be one rule in one court, and another rule in another court, one kind of justice in one place, and another kind in another place. It was from analogy, courts of equity adopted the statute of limitations as applicable to legal demands, and from analogy I am led to apply the provisions of the statute now under consideration to proceedings on claims before the Surrogate. This leaves the law consistent, harmonious and symmetrical, in all its departments of administration.

On coming to apply the statute to the case now before me, I find the main difficulty to consist in determining whether the claim in question was " disputed or rejected " within the meaning of the statute. It was presented to the executor in writing on the seventh of April, 1855. Two days after, the executor replied that he could not receive it as a claim, but required " satisfactory vouchers in support thereof," and the claimant's " affidavit according to the statute." A bill of items, amounting to $581 38, duly verified, was accordingly made out by Mr. Barsalou and presented to the executor, who on the 21st of April, 1855, wrote to the claimant as follows :—" Your claim, presented against the estate of William Wright, deceased, I must reject, on the ground that you took his affidavit for the amount of $400, and gave him

credit for said amount; and no circumstance having since occurred which would justify us in questioning the correctness of the affidavit. I do not object to the $181 38." Are the words "must reject" contained in this communication, final and conclusive as a rejection of the claim? The petitioner insists that they are not, and that they were not so intended, and to sustain the position points to his own letter in reply, dated April 28, 1855, wherein he says, "I duly received your letter of April 21st, admitting my claim for $181 38, but stating that you want to reject the balance of $400, on the ground that I took his affidavit and gave him credit in his lifetime for that amount. However, considering the nature of the affidavit, and the manner in which it was received, I beg to enclose a copy of it, thinking that when you settle with the estate, you will find it proper to make a reserve for that amount." Subsequently to this period, there were various communications between the parties, until September, 1856, when the executor in reply to a request from the petitioner's attorneys for a definitive answer in regard to the claim, said, "I have, since I saw you, carefully, and, I think, impartially, considered all the arguments you have brought to bear in relation to the payment of Mr. Barsalou's claim against the estate of William Wright, deceased, but I still am unable to discover any reason for changing the opinion I expressed in my letter to Mr. Barsalou of 21st of April, 1855."

There does not appear at any time to have been a dispute of the items of Barsalou's bill, which was for goods sold and delivered; but the controversy related solely to an alleged payment by Wright of $400 to a clerk of Barsalou, who absconded in 1852. Wright in his lifetime had made an affidavit of this payment, and this the executor contended had been accepted by Barsalou as proof of payment. I have no opinion to express as to the merits of that question, but am only called upon to consider whether the demand was so rejected by the executor, as to prevent the court from reaching and passing upon the merits. There can be no

doubt that, if the executor had rested upon the notice contained in the letter of April 21, 1855, as a positive rejection, and had refused to parley with the creditor on the subject, the language of the letter was sufficiently explicit to constitute a dispute or rejection of the demand. If that attitude had been taken at the outset, the creditor would have known where he stood, and have been bound to act hostilely. But when with the rejection a reason for it was given; when by the correspondence and conduct of the claimant the executor was apprised that the rejection was not esteemed as definitive, but only as deliberative; when the arguments were considered between the parties *pro* and *con*, and the facts were further investigated; when the executor, in his last letter on the subject, alludes to the alleged rejection in April, 1855, as an " opinion;" when down to the time of this trial the claimant had never learned that the executor regarded it as a rejection on which the statute of six months limitation began to run; when, in fact, there was no reference to the statute even after the efflux of the six months, but the parties were still treating; under such a state of circumstances, I have no doubt that it is the duty of the court to interpret the whole matter through from beginning to end in harmony with the conduct of the parties. On either side there was a mutual effort to convince each other. A strict view of the letter of April, 1855, as a rejection under the statute was never even suggested. The subsequent communications were inconsistent with such an idea. If the executor intended to avail himself of the statute, and to occupy that ground, he should have stood upon it, so that it could have been seen that he was an adversary. When he entered into the field of argument and deliberation, good faith required that a new attitude or the resumption or the reservation of an old one, should be signified, so that the other side might not be misled. That notice was substantially given by the letter of September, 1856, and not before. The statute consequently is not a bar to the present proceeding.