SKINNER *v*. SKINNER.

*(Supreme Court, Special Term, New York County.* February 26, 1887.)

---

*In re* MILLER'S ESTATE.

*(Surrogate's Court, Chautauqua County.* December, 1889.)

1. EXECUTORS AND ADMINISTRATORS—REJECTION OF CLAIM — LIMITATION OF ACTIONS.

In an action against an executor on a claim based on a note signed by his testator as surety, two of the legatees and the executor, who was also a legatee, testified that on the presentation of the claim the executor told the claimant that the estate was not liable; that he would not pay it; and that the claimant should look to the principals on the note.    This testimony was contradicted by the claimant.    About 20 months after this the executor served a written notice of rejection on the claimant's attorney, who had the note in his possession, and who had received several payments thereon in testator's life-time.    The attorney testified that, though he had a conversation with the executor about the note, he had no notice of the rejection of the claim until the notice was served.    *Held*, that the evidence failed to show such a decided, unequivocal, and absolute rejection of the claim as to bring it within Code Civil Proc. N. Y. § 1822, which provides that suit must be brought on a claim rejected by the executor within six months after its rejection.

2. SAME—ALLOWANCE OF CLAIM.
    An attempted rejection of a claim against his decedent's estate by an executor, made 20 months after its presentation to him, comes too late, as the executor's silence amounts to an allowance of the claim.

Petition by Eliza Banks, a legatee under the will of Adam Miller, deceased, to compel Charles N. Miller, the executor, to account and pay her legacy. During the proceeding a question arose as to whether the executor had allowed or rejected the claim of E. M. Spink, a creditor of the estate. Code Civil Proc. N. Y. § 1822, provides: "Where an executor or administrator disputes or rejects a claim against the estate of the decedent exhibited to him, * * * unless the claim is referred as prescribed by law, the claimant must commence an action for the recovery thereof against the executor or administrator within six months after the dispute or rejection."

*J. G. Record,* for creditor.    *W. B. Hooker,* for executor and legatees.

SHERMAN, S.    It appears that the deceased made his will, dated July 17, 1883, which was probated April 27, 1885, and appointed his son, Charles A. Miller, sole executor. The deceased left, him surviving, three children,—said Charles A. Miller, Ann Elizabeth Banks, and Esther E. Reed,—and his widow, Eliza Miller. He gave his entire estate, valued at about $5,000, to his said three children, share and share alike, giving nothing to his widow. By a written agreement between his widow and three children, the widow is to have one-fourth of his estate, and the children each one-fourth. A petition was presented by said Eliza Banks to compel the executor to account and pay her legacy, in which proceeding the question arose, and was litigated, as to whether the claim of about $1,000 of E. M. Spink, a creditor, had been allowed or rejected by the executor. It appeared that upon March 27, 1882, W. H. and Frank Baldwin borrowed of Spink $1,484, for which they gave him their note, payable in September following, which was signed by John Miller and the testator, as sureties; and the Baldwins gave to the two Millers a chattel mortgage on farm property for their indemnity; that the Millers refiled the mortgage during two or three years only; that a portion of the mortgaged property was burned about the year 1887, when covered by an insurance, from which a part of the $350 was paid and indorsed on the note March 26, 1887, being the last of the several payments made thereon; that a part of the mortgaged property was sold from time to time, and the proceeds of a part of the same paid upon the note, and a part of the property, of little value, remained unsold, and in the possession of the Baldwins, at the time of the trial herein, and a portion of the same property was worn out and used up by the Baldwins on their farm. The note or obligation so given was joint in form, not negotiable. The claim of the creditor, Spink, duly verified, was presented by him to the executor at the former residence of the testator, in the presence of his widow and the two daughters named, on May 31, 1887. Mr. Spink, the creditor, the executor, and two daughters testified as to what occurred on that occasion, as to whether the claim was then rejected or allowed; and the substance of the evidence of each is as follows:

E. M. Spink, creditor, testified that he personally handed the claim to the executor, Charles A. Miller, who read it, and that he told him it was a claim Judge Warren had made out against the estate; that the executor at no time said anything about not paying the claim; that he had before asked the executor to see the Baldwins, and get security from them; that the executor did not tell him to look to the Baldwins for his pay. The payments on the note were made to Judge Warren, his attorney, by the Baldwins. Ann E. Banks, a legatee, testified: "I recollect of Spink coming to our house only once. I heard my brother, Charles, tell him that our estate was not holden for that claim; that he must look to the Baldwins. My mother, Charles, Mr. Spink, and Esther E. Reed were present. I was not there all the time Charles was.

I was not in when Spink first came in. Nothing more was said. I never heard him (Charles) verbally reject the claim. Early in February, 1889, when Charles came back from Ohio, we talked about this claim." Esther E. Reed, legatee, testified: "Mr. Spink came to my mother's in the latter part of May, 1887. I heard talk between him and Charles in sitting-room. I heard Charles say that father's estate wa'n't holden for that claim; that he wa'n't holden for it; and that he referred it to the Baldwins. I don't recollect anything else. I did not hear it all." On her cross-examination, the witness testified: "I was there sewing,—helping mother to go west with Charles. We talked of this in our family when she went west. It had been talked at our house, in our family, in February, 1889. Mrs. Banks was there, and we talked it over, and agreed what was said. We were talking of our business. I did not hear much what Spink said when he presented the claim. He talked very low. I heard Baldwin's name mentioned several times. I was across the room, not very near to them, when they were in the house. I was busy sewing. They were close together, quite a few steps from me. My brother Charles said father's estate wa'n't holden for that claim; that Mr. Spink would have to look to the Baldwins for the claim. I could not hear, and don't know what Spink said. I am a legatee under the will. I did not see Charles until February, 1889." Charles A. Miller, executor and legatee, testified: "Spink came to the house, and presented his claim to me. I looked at it, and saw what it was. I told him it did not belong to the estate to pay. He said that he had waited a good while, and did not want to make him any trouble, but he should have to proceed to collect it. This is the substance. Then I said I could not do anything about it as executor; that I could not pay it; that I had no right to pay it; that he would have to go and see the Baldwin brothers, or those on the note before my father's name. As he went out of the door, I stepped out on the stoop; and he wanted to know if I couldn't, as I had property in my hands to, pay him, and fix it up with the Baldwin brothers and my uncle, John Miller; that I could do better with them than he could, and he talked there several minutes, and begged of me to go and see them, and see if I could · not get them to fix it up; that I could get security from them better than he could. I told him that I did not think I could. I do not remember that anything else was said. I did not tell him that I had been advised about the claim. I had before this taken advice of Judge Lambert, and of an attorney in Akron, Ohio, as to my liability on this note. My home was at this time in Akron." On his cross-examination, the witness testified: "Spink spoke of my having property of estate in my hands as executor, not of Baldwins, given to Miller as security for signing., I said it belonged to the Baldwins to pay, and not to the estate to pay. I don't remember that I did. Am not positive I told him I had taken counsel about the claim. I am positive I did, either in the house, or outdoors, on the stoop." E. M. Spink, recalled, testified: "Charles A. Miller did not state that his father's estate was not holden for that claim. He did not state that he had taken counsel on the claim, nor that he could not pay the claim, nor that it did not belong to the estate to pay, nor that I must look to the Baldwins for it." It appeared in evidence that E. F. Warren had the note in his possession, as attorney for Spink, from about the time it was given, March 27, 1882, until after the last payment was made, in February, 1888, during which time ten payments were made on the claim to Warren, as attorney for Spink, by the Baldwins. It appeared that about September 1, 1888, the note was about to outlaw as to John Miller, he not having made any payment on it, and that Spink was about to commence an action in the supreme court, and papers were prepared by Warren for service upon the Baldwins and John Miller, when an arrangement was made, under the advice of Warren as attorney for Spink, by which the note, of which the following is a copy, signed by the Baldwins and John Miller, was given for the amount due to Spink on his claim.

"$971.82.

"One year after date, I promise to pay to the order of E. M. Spink, nine hundred and seventy-one dollars and eighty-two cents, with interest, for value received.

"*Dated September 5th,* 1888.

[Signed]

"W. H. BALDWIN.
"F. BALDWIN.
"JOHN MILLER."

Spink, by the arrangement made, continued to hold the original note or claim against the estate of Adam Miller. It also appeared in evidence that on the 11th day of February, 1889, Charles A. Miller, executor, served personally on Spink notice of rejection of the claim, of which the following is a copy:

"FREDONIA, NEW YORK, February 11, 1889.

"*To E. M. Spink, Esq., and Hon. E. F. Warren, His Attorney*—SIR: You will please take notice that I doubt the justice and validity of your claim of $1,484, with interest from March 27, 1882, less several payments, against the estate of Adam Miller; and I hereby dispute the same, and offer to refer it, under the statute, to some suitable and proper person as referee, to be approved by the surrogate.

"I am yours, very truly,      CHAS. A. MILLER,

"Executor of the Last Will and Testament of Adam Miller, deceased.
"Copy for Judge Warren."

On the following day Spink returned such notice to Miller, the executor, with the following notice indorsed thereon:

"This notice is returned on the ground that it has not been served in season.      Yours, etc.,      E. F. WARREN, Attorney for E. M. Spink.
"*February* 12, 1889."

No evidence was given as to the solvency of the Baldwins except that of W. H. Baldwin, who testified that he did not know about the responsibility of his brother, F. Baldwin, or John Miller, but, as for himself, he owned property, above incumbrances, enough to pay this note. E. F. Warren, who, as attorney for Spink, held the claim during several years, and received and indorsed all the payments upon it, testified that the new note was given under his advice, as the old one was about to outlaw as to John Miller, who had made no payment upon it, and that that was the only reason for giving the new note. He also testified that, as attorney for Spink, on January 25, 1887, he wrote a letter to Charles A. Miller, at Akron, Ohio, about this note,—the first one,—and soon afterwards had talk with Miller about it, and that said Miller then said that his father was surety on the note; that it was the Baldwins' debt, and that they ought to pay it,—and that that was all there was said. He also testified that there had been no rejection, or notice of rejection given to him, prior to the written one February 11, 1889.

I am of the opinion, after careful examination of the evidence and authorities bearing upon the question involved, that what was said when this original claim was presented to the executor, on May 31, 1887, did not amount to a legal rejection or dispute of the claim, so as to require the creditor to offer to refer, or to sue in six months thereafter, to prevent the short statute of limitations from barring the claim, as provided by section 1822 of the Code of Civil Procedure. I am not satisfied that the creditor understood that the claim was rejected. It appears that the executor and his counsel must have so understood it, from his serving the written notice of rejection one year and eight months afterwards. It was then too late. The claim had then become liquidated, adjusted, and allowed by lapse of time, and by the silence and acts of the executor. In *Lambert* v. *Craft,* 98 N. Y. 344, a controlling

case on the question involved, less than two months elapsed from the presentation of the claim to its attempted rejection; and the court says that "under these circumstances the executors are either chargeable with knowledge of the fairness of the claim, or were bound to some degree of active diligence in ascertaining whether it was just; and their silence might well be deemed a substantial allowance of it as a debt to be paid in due course of administration." In this case, as in that above cited, the executor had a direct personal interest, as a legatee in the estate out of which payment was required, and he had full knowledge of the condition of the estate, and character of the claim; making it all the more imperative upon him to have given decided, unequivocal, and absolute notice of rejection. I think that such notice was not given in this case. In this case, which is similar to *Hoyt* v. *Bonnett*, 50 N. Y. 538, the alleged rejection appears to have been made on the ground that the debt was one that the Baldwins should pay, and not on the distinct claim of its illegality. In the case last cited, the court of appeals says: "Justice to the claimant, as well as the reasonable interpretation of the statute, requires that the act of the executor or administrator in disputing or rejecting the claim which is to put the claimant to an action within the brief period prescribed, upon pain of forfeiting his claim, should not be ambiguous or equivocal,— capable of two interpretations,— but decided, unequivocal, and absolute," and that "to construe and apply the statute in a manner more liberal to representatives of estates would make it a trap and a snare to claimants." *Kidd* v. *Chapman*, 2 Barb. Ch. 414. *Barsalou* v. *Wright*, 4 Bradf. Sur. 164.

There is an equitable side to the question involved. There was no direct proof showing the value of the farm property covered by the mortgage given for indemnity to Adam and John Miller by W. H. and F. Baldwin. And, in the absence of such proof, it appears a reasonable presumption that it was of sufficient value to indemnify them as sureties, against this claim of Mr. Spink, who was chiefly instrumental in securing the new negotiable note signed by John Miller and the Baldwins, dated September 5, 1888, upon the payment of which by the executor, the estate will be entitled by subrogation to the possession and ownership of such note, as well against John Miller as the Baldwins. In the event of the non-payment of the note by the Baldwins, this estate would have to pay its equitable share of the resulting loss, with John Miller. The Millers negligently permitted the mortgaged property to remain in the possession of the Baldwins, against the interest of Spink, until a portion of it was worn out and used up by the Baldwins; also, neglected to keep the security good by filing a copy of the mortgage from year to year after the first two or three years. Some of the property was burned in 1887. How much, does not appear. Neither does it appear how much of the insurance money was used in the payment of the $350 indorsed on the Spink claim May 26, 1887. It would appear that, as the executor and John Miller must have had knowledge of such material proofs, and should have presented same, and not having done so, the reasonable presumption is that the real facts of the case within their knowledge would have been against them, if proved.

I direct a decree adjudging that the creditor duly presented his claim; that the executor neither legally disputed, rejected, or offered to refer it, but allowed it, and that he pay same, with interest, out of the estate in his hands, with costs in this proceeding; and that the proceeding herein, on the petition of Ann Eliza Banks, as legatee, for an accounting by the executor, and to pay her legacy, be adjourned to the ——— day of December, 1889, at 10 o'clock in the forenoon.